May it please the Court, good morning. Pamela O'Leary Tower on behalf of Landon Rudolfo. I haven't done an oral argument in quite a while, so I decided to do a checklist from the ABA to see what I should prepare for. One of the pieces of advice was that I should consider making concessions. The government has made two concessions in their answer brief. They have essentially confessed error. I'm willing to go out on a limb here and say that perhaps the 404B evidence that I challenged in my very first citation of error in my brief is perhaps direct evidence that doesn't really change the overall flavor of the cumulative error analysis. I would also like to reserve five minutes for rebuttal. Okay. Try to keep your eye on the clock. It counts down. Okay. Having made that concession, and it is again our position that it really doesn't affect the overall analysis of what happened at trial here. I think that I should begin with I actually don't know where to begin. I was so astounded when I read this record. Perhaps I'll start with the vouching. I was also doing some more preparation last night and came across what is actually a variant of my argument on vouching, the improper vouching, by Agent Sackanoi for Jeremy Javilla, who had not yet testified. And a variant argument on that same argument is that it's 608 evidence, and it's improper character evidence for a witness who's not even testified yet. So that's another way to look at this argument. But our position is that because the defense attorney objected and the court overruled the objection on the vouching, and the vouching here is critical to this case, I think standing alone, but obviously for the cumulative error argument, Jeremy Javilla was not even going to be called as a witness. It was not until Rodney Sunizumi, the corrupt police officer who had been involved in the vining scheme with Jeremy Javilla, fell apart under cross-examination. He was destroyed by Kei Shigetomi, who's a very fine trial counsel. And it was at that point that the government realized they had to call Jeremy Javilla to establish knowledge. Now, the government says, well, the jury disregarded Jeremy Javilla because they had quit it on conspiracy count, and all that red rogue, Nissan rogue evidence goes out the window because the jury disregarded Jeremy Javilla. And we disagree respectfully because our client was convicted of count two, which did require knowledge, and the only quote, unquote, credible direct evidence of my client's knowledge came from Jeremy Javilla, who had been vouched for by the lead investigating agent on the case before he even took the stand. It would be impossible to recover from the lead agent telling a jury essentially that this upcoming witness, who you've not even heard from yet, is truthful, consistent, reliable. That's essentially what Agent Sackanoi said. The government tries to distinguish Sackanoi's vouching from in-trial vouching to investigative stage vouching because Detective or Agent Sackanoi was setting the context for the investigation. There is no difference. Agent Sackanoi worked with Jeremy Javilla from day one. He knew his weaknesses, and yet he took the stand, and at the prosecutor's prompting and upon his questioning, told the jury how reliable Jeremy Javilla's testimony would be when he took the stand, which he did. And at that point, he takes the stand. The sole purpose was to have Javilla establish that my client knew that the Toyota 4Runner had been vinned. When I use the word vinned, I'm talking about changing the vinned stickers on a car. Let me kind of cut to the chase a little bit here. I think what, I think your concession was a reasonable one, but let's assume that the other three errors that you have argued are in fact trial errors. The government's response is going to be or has been in their favor. The evidence was so overwhelming that even if they did comment on his not wanting to self-incriminate himself, even if they did vouch that, you know, it was so overwhelming he would have been convicted anyway if we hadn't done any of those things. What's your response to that? Their argument basically that it was, oh, well, it was harmless because of the overwhelming evidence. There was no overwhelming evidence. What they had, the only direct evidence they had of my client's involvement and his knowledge was Rodney Sunizumi and Jeremy Javilla. The rest of the evidence that they had, which was undisputed, we never disputed that the 4Runner had been vinned. We never disputed that. And in fact, by the time the investigation had reached its apex and they were making phone calls, Sunizumi was making these phone calls, consensual phone calls to my client, and the 4Runner had been sold to another buyer on the island of Oahu, I think. So, the fact is, is that the evidence they put on at trial to corroborate their two witnesses was the Servco expert from, that's a big Toyota dealer in Honolulu, to establish what fin differences between years of Toyota 4Runner models and where the VIN panels, the VIN markers should be. We never disputed any of that. They put on his friend, Kalani Puu, who, my client's friend, who testified what he would do if he bought a used car. Check the VIN numbers, check this, check that. That's what I would do. And if things didn't look right, like the spun rivet, well, then I might pause. But never saying, you know, that my client should have done those things and that my client would do those things as well, or that anybody else would do those things, because, quite frankly, my client sold the vinned car to another individual who obviously didn't do those things and registered that car legally as well. My client's car was also registered. And that's another one of their witnesses was City and County of Honolulu DMV. Well, the only way the color could have changed on the registration was if my client had allegedly done one of three things. And so, but nobody could say what my client had actually done to change the color of the vehicle on the new registration. Nobody said anything. And it came up in a safety check. So there's, that's pure speculation. It could have been one of three things, none of which are illegal in and of themselves. People have their cars painted all the time. The fact that you would notice that the vinned stickers were a little bit frayed around the edges, the ones in the door jambs, or the rivet was spun. This vehicle was purchased, I believe, in 2011, and I think it was in 2002. It had been around the block. Actually, it had been around a couple of islands. You know, it was not a brand-new car. The only unaltered, mistaken vinned number was on the engine block, which you could only see if you pulled out the engine. And no reasonable person is going to be expected to do that. The... Well, all of the things that you say are in and of themselves. There are innocent explanations. But cumulatively, you know, the testimony, as I understand it, was your client had had and was almost a semi-expert on Toyota 4Runners, and the differences in the year, make, and model is something that somebody with his knowledge would expect to know. He paid a ridiculously low price for it, doubled his money in a year, and usually when cars go down in value. I mean, all these things, any one in and of itself, okay, you can get good deals. Any one is maybe, there's an innocent explanation, but why wouldn't the jury looking at this cumulatively say, well, you know, this guy knew what was going on? Well, I think they could go, you know, this guy knew what was going on. But I call that not proof beyond reasonable doubt. I call that suspicion. And that's not enough. It's never enough. And I think that if we had just the vouching, which I believe, I consider the vouching the most critical of the errors that happened here, that alone, it's incredible to me that you can have the lead agent vouch for a witness the government never even intended to call because he was so suspect. And that's the truth on Jeremy Javillo. They had to bring him in to do cleanup, as I said in my reply brief, because Tsunizumi had been so destroyed. So what the jury is left with basically is now a vouched for witness, even if they disregarded Tsunizumi's testimony totally, and a bunch of circumstantial evidence that is indicative of innocence or guilt. The other thing that's problematic to me is that throughout the trial, these police officers were in the traffic division, including the female police officer who did testify about recovering the or taking the report on the red Nissan. They're in the traffic division. They pull cars over. They give parking tickets, running red lights. These are not the felony detectives that deal with stolen cars. They may discover that a car is stolen when, you know, they ask to see your license and registration, and they may get a hit when they call it in. But other than that, they're traffic cops. That's it. And the testimony about Mr. Rudolfo's expertise and his fact that he was more than someone that liked or loved Toyota 4Runners or Toyotas came from the government's witnesses who were impeached beyond belief. But to try and impeach a witness, Javilla, the last government witness or the second to last witness, that was after being habilitated, basically. He wasn't even rehabilitated. He was habilitated and presented to the jury on a silver platter as, you know, the golden goose. You can trust this guy. You can trust anything he says is astounding to me. Coupled with the intentional elicitation from Agent Sackanoi about my client's decision to not to remain silent when he was searched and the search warrant was executed at his house, to not to invoke his Miranda rights, to invoke his right to counsel and to, quote, unquote, not cooperate, that to me is breathtaking. It is just astounding that that could happen. And the government at trial, when Mr. Shigatomi objected, did not quibble, did not say a word when he asked for a cautionary instruction, did not object or say anything. To this Court now, the government says, yeah, it was probably improper, but it wasn't as bad as other instances, and besides, they opened the door to the inquiry. Because I had to explain why the Nissan sheriffs, the sheriffs who owned the red Nissan had never been arrested or indicted or prosecuted. Because Mr. Shigatomi asked a single question, which is have they, the sheriffs who owned the red Nissan Rogue, ever been arrested or indicted? The answer was no. He did not go any further. In the case the government cites about opening the door, it was the defense that brought in the evidence initially. We didn't bring in the red Nissan Rogue evidence. The government did over defense counsel's rigorous objection and motions in limine that they filed prior to trial. So the government brings in the red Nissan Rogue, has their witnesses talk about it, has Agent Sackanoi talk about it. A question about whether the sheriffs have been arrested is not opening the door under these circumstances. So the the Why don't we have you stop now? You've got a minute and a half left. Thank you. We'll hear from the government, but we'll make sure you get a chance to say what you need to say. Thank you, Your Honor. Thank you. May it please the court. I'm Mark Wallenstein for the United States, and I am the attorney who prosecuted this case. So tell us about the vouching. How did that happen? Don't you talk to your witnesses ahead of time and say you're not supposed to say that sort of thing? Yes, I I would like to acknowledge to your honors that I could have done a better job asking tailored questions to avoid problematic areas. Well, I asked a slightly different question, not about the questions you asked, but vouching is everybody knows it's a bad thing. Yes, Your Honor. How could you possibly have not, I mean, particularly in this circumstance, not said to your witness, you know, you're not supposed to talk about how trustworthy the other witnesses are. Your Honor, I did not intentionally elicit that the case agent talk about the reliability or truthfulness. Yeah, that's still. You're still not answering the question I asked you. Yes, Your Honor. What I was trying to get at when I was asking him the line of questions that's at issue in this appeal was that the defendant, Landon Rodolfo, had not cooperated and that he was the link, the only link in the case between the rogue and the sheriffs. So when the defense, I think it's very important, Your Honor, to realize this vouching took place on redirect and this vouching and the Doyle error take place within a few pages of each other. And if Your Honors are actually considering reversing in this case, I would ask you to read the cross and look at the direct. I mean, excuse me, read the cross and look at the redirect. You'll see that my questions are responding to areas that the defense raised first. On the vouching area, the defense brings up Javillo's credibility. They basically spend 30 minutes hammering the case agent on why would you rely on a scumbag like Jeremy Javillo. Isn't it important that cooperators be truthful? Spends about a half hour saying, what are the FBI's standard procedures when you sign up cooperators? So you're standing there in the parking lot after arresting him and he gets a text message from someone trying to buy drugs from him and you still rely on him? It cannot be that the defense can raise that issue and try to make the FBI look like morons for relying on a criminal and a car thief and a drug dealer like Jeremy Javillo and I can't respond to it at all. I have to be able to respond somehow. I acknowledge that I should have asked more narrowly tailored questions to make sure that the response did not go one step beyond to talking about Javillo's credibility or his reliability. But the questions I am allowed to ask, permissible questions, Your Honor, are questions along the lines of, well, why did you decide to rely on Jeremy Javillo? And the answer is, well, he told us a story about selling a VIN vehicle to a cop and we went and checked it out. We found the VIN vehicle and the people who had it bought it from a cop. So that corroborated his story. He did what he said he was going to do, at least as far as my interactions with him were concerned. He told us X, Y, Z, X, Y, Z, checked out. That's what law enforcement does. We don't choose to use the criminals as our cooperators because we like them. We use them as cooperators because they're the ones who know who else has committed crime. And in this case, you know, I really have learned an immense amount from this appeal. I think a very subtle difference in the questions that I would have asked would have caused the case agent to not make some of the references that he made. And I asked a bit more open-ended questions than I should have. Now, you still haven't answered my question. Yes, Your Honor. And it may be that I'm asking too much. And I know lots of things just happen in the sort of the heat of the moment or the heat of battle or whatever metaphor we want to use. But I gather you did not instruct the witness as to the things that were forbidden vouching. That is to say, the witness had not been told by you that you can't say, I believe him, he is a trustworthy person. So I don't generally as a practice teach FBI agents you're not supposed to talk about the invocation of the Fifth Amendment. In hindsight, given that there was an invocation, I probably should have focused on that during PrEP. I acknowledge that. But this issue just didn't arise during PrEP. It came up during trial. I did not anticipate it. I wish I had. I've learned to do so. But I submit that the error that I have acknowledged and learned from is not reversible error. So can we come back to then Judge Malloy's question, which is to say, okay, we heard from the other side how weak your evidence is. Maybe you'd like to tell us how strong your evidence is. Yes, Your Honor. On the harmless error point, Juvillo's testimony was basically inconsequential with respect to the defendant's knowledge that the forerunner that he purchased was stolen. Juvillo's testimony I asked a different question. I didn't ask about how inconsequential Juvillo's evidence was. I asked about what's the strong evidence for your case. Yes, Your Honor. Defendant Rodolfo's knowledge was proven up through admittedly circumstantial but extremely strong circumstantial evidence. The first piece of strong circumstantial evidence is the audio recordings. There are four audio recordings of conversations between the defendant and his friend Roddy Tsunizumi where Tsunizumi says, they've got me. They've got me roped, which is where your police authority is removed for doing something wrong. They're both police officers. And Tsunizumi's the one who sold the forerunner to Rodolfo. Tsunizumi says, they roped me. Rodolfo says, what are the charges? He says, well, I think it's about the stolen VIN forerunner that I sold you. And his response is not, what are you talking about, stolen VIN forerunner? His response is, well, why don't you just stick to the story? Why don't you just tell him you bought it on Craigslist? His response is to try to help him come up with a workaround. And I submit that an innocent response is going to be, what are you getting me into? What are you talking about? So the audio recordings are, just because it's circumstantial evidence does not mean it's bad evidence. We prove cases through circumstantial evidence. That's how trials get proven. That's why you have trials. But that's what ultimately makes trials go one way or the other. The next piece of evidence is the photographs of all the missing VIN stickers all over the vehicle. And I would like to correct the record factually. Appellate defense counsel said that, you know, the car had kind of been around the block and the VIN stickers were, you know, frayed and they get frayed. I've actually included some of the photographs of the VIN stickers that have been removed in the S.E.R. So that's S.E.R. 537, 538, 539, 545, 546, 547. The last 30 or 40 pages of the S.E.R. are my trial exhibits. If you look at them, they are large rectangular areas visible from standing outside the car if the door is open, where there's this gummy residue, a rectangular gummy residue where someone has clearly removed the VIN sticker. And if you look at the VIN plate underneath the windshield, you'll see that it has a marking etched into it, which is a security device that manufacturers use. They put a rivet in there that has a little tine. So if you try to remove the VIN plate from one vehicle and put it on another, it leaves this marking in the VIN plate that you can see visibly. And a trained police officer, there was testimony from Makari Akero, another officer, and Kalani Pu'u, who's also a police officer. They're trained in VIN plates and VIN stickers. A trained police officer buying a used vehicle for basically half its actual value. Someone who is an undisputed Toyota enthusiast, and Toyotas are a big deal in Hawaii. We carry around surfboards and outdoors equipment. People get really into these off-road vehicles. I have one myself. Someone like that is going to know that that vehicle is stolen. And all he has to do is look at the windshield and see the markings, the visible markings on the VIN plate. All he has to do is open the door, any of the doors to the vehicle, and look at the gummy residue. And he knows, wow, there's a VIN sticker missing. I better check and see. Do something different. And if you run the numbers, if you run the numbers on the fake VIN plate or the fake door sticker, it comes back to a black 98 4Runner. The vehicle he was dealing with was a silver 2000 4Runner. And the differences between the 98 and the 2000 are significant. This is the most major body type difference in the manufacturing of Toyota. And I put on three expert witnesses from Servco Toyota, which is the only Toyota dealership in Hawaii. One had worked there for over 40 years. One had worked there for over 30 years. One had worked there for over 20 years. I mean, these are genuine experts in this field. And they explained, look, the 2000's got a hood scoop and it has these aggressive fender flares. And these are things that Landon Rodolfo himself found desirable when he ordered the vehicle. He asked his friend, Roddy Tsunizumi, for a 4Runner with a hood scoop. The 98 doesn't have hood scoops. They hadn't invented them yet. They came in in 1999. And those are things that Mr. Rodolfo would definitely have known. Now, in order to know that the VIN number corresponded to the earlier year, he would have had to run the VIN number? That's correct. There's not something on the VIN number itself that says this is a 98 vehicle? That's correct, but he would have known it was a 98 because he registered it in his own name. So on the face of the registration, when he switched it from the prior owner to himself, it was a black 98 registered in his name. And then at some point later, he changes the color to silver. It's a silver 98 registered in his own name. Now, it is theoretically... So the registration still continues to say 98. It says Landon Rodolfo, black 98. Landon Rodolfo, silver 98. Even though it's a 2000 vehicle? Correct. Okay. Got it. And the defense mentioned, and I want to be forthcoming about this, it's theoretically possible that a safety inspector changed the color, not Mr. Rodolfo. But that was unlikely, is what the DMV witness testified. The DMV witness testified that most likely what happened, based on the way it was logged in the computer system, is that Landon Rodolfo himself changed the color from black to silver. So a trained police officer and Toyota enthusiast has a 2000 body vehicle that's silver. His registration, as he's changing the registration name, registering it in his own name, it says it's black and 98.  There are missing stickers all over the vehicle. There is a spun plate, a spun rivet on the plate under the windshield. And he purchases the vehicle for about half of its value. And then two years later, after driving it around as his main vehicle, his main police vehicle, he sells it for more than double what he paid for it. How often, Your Honors, does that happen? And I just submit that I appreciate that the defense has made a concession with respect to the first point of error. And that's really been the tone of this trial, that sort of approach from both counsel, both Mr. Shigatomi and my adversary here and myself. I was forthcoming with the defense and the trial attorneys about my plan for the trial, what witnesses I was going to call that I didn't know if I was going to call, Jeremy Juvilo. And at trial, when the error came up, Mr. Shigatomi, when the vouching error came up, Mr. Shigatomi even said that he didn't believe I'd done anything malicious. It's on the record. And he asked for a cautionary instruction. And I didn't object. I said, sounds good, great. He gave the cautionary instruction. There was no motion for a mistrial. There was no motion to strike for either of these. And we moved on. And I just ask, if Your Honors are considering reversible error in this case, take a look at that cross and take a look at my redirect. And you'll see that I am coloring well within the lines, though I acknowledge I could have done a better job. Let me ask you about Juvilo's testimony that the defendant knew he was a Carthief. He had never met the defendant. So how can he give that as, how can that be a lay opinion? At best, it has to be based upon inadmissible hearsay. So, Your Honor, I don't know that the lay opinion issue is driving the train on this appeal. But to answer your question, there was ample fact testimony from which those conclusions could be drawn, fact testimony that was not objected to. So Landon Rodolfo went with Kalani Pu'u to Jeremy Juvilo's house, it was actually Jeremy Juvilo's cousin's house, but he was living there, to recover a tow truck that they both knew Juvilo had stolen from Mr. Pu'u. Why not just rely upon that? Why have somebody get on the stand and say, well, he knows I'm a Carthief, because everybody knows I'm a Carthief. You know, in hindsight, I wish I would have. Why not just rely on the facts? In hindsight, Your Honor, I wish I would have. I really do. And I've learned to do that. Sometimes asking that extra question isn't worth the trouble on appeal. But I submit that that error is mere trial error. And I submit, Your Honor, that it is permissible lay opinion testimony. This is the sort of thing that juries get. They understand when one car guy says, yeah, that car guy had to know. I'm a car guy. He's a car guy. This is the body type. And I should have made that argument at closing. Rather than having Jeremy Juvilo do it, I acknowledge that. But I submit that it absolutely does not rise to the level of reversible error. Roberts. Okay. Thank you, Your Honor. Thank you. Thank you very much. Response. Mr. Shigatomi is a very nice man. I find, and I believe to this day, to this moment, that the conduct of the prosecutor at the trial in this case was intentional and it was knowing. I find nothing unintentional about what he did. What happened here in this trial with regards to the vouching, the invocation of the right to counsel and to not cooperate, and to the, especially the lay opinion testimony, because he had already been told by the district court that that would not be permitted. And he asked to re-argue that issue. And the district court says, well, that's a little speculative as Judge Malloy pointed out. You know, you never met the guy. But I think Mr. Shigatomi, with all of his skill, can overcome that in cross-examination. The trial error here is not mere trial error. It is a violation of Mr. Rudolpho's due process right to a fair trial. Every question that was asked by the prosecutor, particularly beginning with the vouching, was intentional. It was intentional. And when Mr. Shigatomi objected and the district court overruled his objection, it continued. It served the prosecutor's needs, which was to rehabilitate a witness they were now forced to put on, which they now say they wish they hadn't. In hindsight, hindsight is 50-50. My client was convicted because of the trial error that was committed here. Thank you. Thank you very much. Thank both sides for their arguments in this case. United States v. Rudolpho submitted for decision.
judges: Fernandez, W. Fletcher, Melloy